Argued December 21, 1972, reversed February 26, petition for
rehearing denied March 22, petition for review denied
April 27, 1973

STATE OF OREGON, *Respondent, v.*
VIRGINIA VOIT (No. C 72-02-0729 Cr),
*Appellant.*

STATE OF OREGON, *Respondent, v.*
DORIS (DENNIS) STRONG
(No. C 72-02-0730 Cr),
*Appellant.*
506 P2d 734

*August F. Hahn,* Long Beach, Washington, argued the cause for appellants. With him on the brief was Miles Sweeney, Portland.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FORT and THORN-TON, Judges.

SCHWAB, C.J.

On Monday, January 24, 1972, at 1:40 a.m., a

police officer on routine patrol saw a station wagon parked on the shoulder of the Lombard Street Extension south of Marine Drive, near the Portland airport. He discovered the body of Joseph Voit, Jr., lying on its side on the front passenger seat. Death was caused by skull injuries inflicted by blows with a blunt instrument. No weapon was found at the scene. The wallet of the decedent was missing. The record does not indicate that anything of particular value was found on the body.

■ The decedent's wife, Virginia Voit, and her sister Doris (Dennis) Strong were indicted and upon trial by jury were found guilty of the murder. ORS 163.115. On appeal, the determinative issue is whether there was sufficient evidence to support the conviction. For the reasons which follow, we find that there was not.

At the trial, four airport employes testified they saw the station wagon parked on the Lombard Street Extension early Sunday morning, January 23, before 8:30 a.m. Three of those employes had driven the same route to or from work the previous night, past the point where the car was later found. One of them, a Miss Schonert, testified that she had seen the car parked there on Saturday night, January 22, 1972, between 10:30 and 10:45 p.m. She admitted that visibility was poor that night, and that her opportunity for observation was limited to about three seconds. The other two witnesses, who passed the same place within an hour after Miss Schonert, testified they did not see the car there that night.

Both defendants made statements to the police and testified at trial as to their activities at all relevant times.

Virginia Voit's testimony was as follows. On

Saturday, January 22, 1972, her husband was out in the afternoon, and returned home before dinner, somewhat intoxicated. Dinner consisted of rice, stew meat, gravy, corn, and either a salad or pickles, followed by strawberries over cake. He finished dinner between 7:30 and 8 p.m. Mr. Voit went to sleep on the couch. At approximately 10 p.m., Mrs. Voit received a call from the other defendant, Doris Strong, who had driven from her home in Long Beach, Washington, to the Jantzen Beach area in Portland, and needed directions to get to the Voit house. When she was unable to understand Mrs. Voit's directions, Mrs. Voit agreed to meet her so that Doris Strong could follow her home. Mrs. Voit drove the station wagon to the place where she was to meet Doris, and they had coffee in the adjacent Denny's restaurant. They observed a county sheriff in the restaurant interviewing people.

Doris Strong followed Mrs. Voit to the Voit home. Shortly after their arrival, they began playing Pinochle and drinking bourbon with Joseph Voit. An argument ensued, and Mr. Voit threatened to shoot Doris Strong. Such threats by Mr. Voit were common and were not taken seriously.[1] He put on his jacket and left the house, telling Doris Strong he wanted her out of the house before he returned. The defendants did not see Mr. Voit alive again.

After Mr. Voit's departure, Mrs. Voit and Doris Strong had coffee and sandwiches. Doris Strong left to return to her home at a time Mrs. Voit did not recall. Mrs. Voit went to sleep. About 4 a.m., Sunday morning, she woke up and telephoned Doris Strong's home in Long Beach to see if she had arrived home safely.

---

[1] Both defendants testified that the Voits frequently visited the defendant Strong at her home in Long Beach, Washington.

Mary Lou Strong answered the telephone and advised Mrs. Voit that Doris Strong had not yet returned home.

Defendant Doris Strong is a sister of defendant Virginia Voit. Some years prior to the murder of the decedent, Doris Strong had assumed the identity of a deceased brother named Dennis and had assumed a man's role since that time. Doris Strong, under the name of Dennis Strong, had lived with Mary Lou Strong at least since May 11, 1967. Mary Lou Strong testified that they went through a marriage ceremony on that date. They lived in Long Beach, Washington, were employed by the Ocean View Rest Home, and had owned a western-wear store in that city for approximately four years.

Some time after Mrs. Voit's call, Doris Strong returned home. Mary Lou Strong called Mrs. Voit that morning, January 23, at about 7:30 a.m., and advised Mrs. Voit that Doris had returned safely. Mrs. Voit told her that Mr. Voit had not yet returned home.

The morning of January 23, Mrs. Voit telephoned the police, hospitals, and Mr. Voit's friends, Darrell Alcorn and Roy Mattinen, in an unsuccessful attempt to locate Mr. Voit. Mr. Alcorn and Mr. Mattinen were called as witnesses by the state, and verified receiving these calls from Mrs. Voit.

Mrs. Voit also contacted Mr. Voit's sister and brother-in-law, Mr. and Mrs. Carney. The Carneys and Mrs. Voit searched unsuccessfully for Mr. Voit, checking at taverns and clubs that he customarily frequented.

Mrs. Voit and the Voits' 2-year-old daughter stayed at the Carney home from Sunday afternoon until contacted by the police the following morning.

Mrs. Voit had advised a neighbor of her whereabouts and asked to be contacted at the Carney home when Mr. Voit returned. Following discovery of the body in the station wagon, which was registered in Mrs. Voit's name, the police were able to locate Mrs. Voit through the neighbor. On Monday morning, January 24, police arrived at the Carney home and had Mr. Carney go to the morgue to identify the body of Mr. Voit.

Mrs. Voit testified that at the time of Mr. Voit's death she was planning to divorce him because they were incompatible. After his death she learned for the first time of the existence of life insurance benefits through Mr. Voit's employment amounting to $8,000. There is no evidence in the record that Mr. Voit had any other assets of consequence.

The testimony of Doris Strong concerning the events of January 22 was consistent with the testimony of Mrs. Voit. Her time card at the Ocean View Rest Home showed that on January 22 she punched in for work at 11:09 a.m., and punched out at 7:53 p.m. Upon leaving work, she decided to visit her sister, Mrs. Voit, in Portland. Police detectives testified that the trip from Long Beach to Portland takes at least two hours. Upon reaching the Jantzen Beach area some time after 10 p.m., Doris Strong telephoned Mrs. Voit seeking directions to the Voit home. She was unfamiliar with that area, having been to the Voit home on only one prior occasion, and could not understand Mrs. Voit's directions. When Mrs. Voit arrived at the Jantzen Beach area, the two went to Denny's restaurant for coffee. While at the restaurant, Doris Strong noticed that the personnel changed shifts. The assistant manager of the restaurant testified that the shift change takes place at 11 p.m. Doris Strong also noticed

a deputy sheriff questioning employes of the restaurant, and she was told by a waitress that it concerned a missing girl. Some time after the shift change, Doris Strong and Mrs. Voit left the restaurant, and drove separately to the Voit home. Doris Strong observed that Mr. Voit had been drinking, but did not appear drunk. Following the argument over cards, Mr. Voit left the home, probably around midnight. She and Mrs. Voit had coffee and sandwiches, and she then returned home, arriving some time after 4 a.m.

An autopsy performed by Dr. Lewman, a pathologist, established that the cause of death was four blows to the head on the right side above the ear. The proximity of the blows and the lack of hemorrhage on the left side of the head led Dr. Lewman to conclude that decedent's head was resting against something soft and was probably immobile when the blows were struck. However, he testified further that the first blow to the head probably caused unconsciousness and could have been rendered while decedent was erect.

Dr. Lewman examined the stomach contents of the decedent, and found a quantity of pickles, celery and strawberries. Based on the rate of digestion of these materials, he concluded that death had occurred two to four hours after decedent ate those foods. Relying on information from the sheriff's office that decedent had eaten before 7:30 p.m., he gave his opinion that death had occurred between 9:30 p.m. and 11:30 p.m.

Dr. Lewman further testified that he had found no evidence in the stomach of the other foods that decedent was reported to have eaten at 7:30 p.m., although there was well-digested food found throughout the intestine. He testified that he had reached his con-

clusion as to time of death by rejecting the information that decedent had also eaten stew meat, gravy, rice and corn. Inasmuch as beef, corn and rice digest slower than the matter found in decedent's stomach, Dr. Lewman concluded that either decedent did not eat the meat, corn and rice at 7 p.m., or decedent ate the pickles, celery and strawberries at least two hours after dinner, and death had occurred at least two hours after that, some time after 11:30 p.m.

A sample of decedent's blood showed a blood-alcohol level of .25 percent by weight, more than twice the amount which supports a presumption that a person is under the influence of intoxicating liquor.[2] The state's witnesses placed the decedent at two taverns on the afternoon of January 22, and testified that he consumed a maximum of seven beers by 6:30 p.m. Based on that information, Dr. Lewman concluded that decedent's blood-alcohol level at 6:30 p.m. would have been .06 percent to .08 percent. Assuming decedent ate only pickles, celery and strawberries between 7 p.m. and 7:30 p.m., Dr. Lewman estimated that decedent would have had to have consumed 13 to 14 ounces of 100 proof whiskey to reach a .25 percent blood-alcohol level by 11 p.m. on January 22.

The decedent's clothing, automobile and home were examined by laboratory technicians. Blood and dirt were found intermixed on decedent's clothes, and it was impossible to tell whether the blood was on top of the dirt or vice versa. The dirt was of a type commonly found on garage floors or in any covered area

---

[2] "Not less than .10 percent by weight of alcohol in his [an automobile driver's] blood, supports a disputable presumption that he was then under the influence of intoxicating liquor." ORS 483.642(1)(c).

where automobiles are often parked, and was very similar to that found on the garage floor at decedent's home. Dirt found on the driver's seat of the station wagon was not examined nor compared with that found on decedent's clothes.

Blood and hair from a big game animal were found on the interior car roof and on various articles in the car. Decedent's wife described him as a hunter. Human blood was found in the area of the front seat where the body was lying. Blood found on the top of the front seat backrest, in the middle, was not examined by the state until during the trial, and could not be determined to be animal or human blood.

Examination of the home and garage disclosed evidence of animal blood on a rug taken from the garage. Small spots of blood were found on two of the bedroom walls, but there was not enough blood to determine whether it was human or animal, or how old it was.

Defendants called Mrs. Davis, a waitress, and Mr. Mueller, the assistant manager, from Denny's restaurant at Jantzen Beach. Mrs. Davis testified that she arrived at the restaurant at approximately 10:20 p.m. on January 22, to begin work at 11 p.m. She noticed two county officers talking to the mother of a missing girl and testified that she talked with Doris Strong about the incident. She remembered refilling the coffee cups of Doris Strong and someone with her. She recalled Doris Strong because she was the first lesbian she had seen in Oregon. In answer to a question put to her on cross-examination, Mrs. Davis said that it was not possible that the incident with the county officer took place on January 8, rather than January 22.

Mr. Mueller testified that Mrs. Davis regularly worked Friday and Saturday nights; that she worked Saturday night, January 22, and that he also saw the county officers investigating the missing-person report on January 22. He remembered that date because the missing-person investigation occurred one night after difficulties associated with icy roads.

In rebuttal, the state called Deputy Sheriff Lee Houston who testified that he worked the 4 p.m. to midnight shift on January 22, in the district encompassing Denny's restaurant, and that he did not visit the restaurant on that date. He stated that no other officers would have been dispatched to handle calls in his area if his workload became too heavy. He testified he took a missing-person report from a missing woman's sister at Denny's restaurant on February 8, a Tuesday night.[9]

The state's theory of the case is that the defendants murdered the decedent in the bedroom of his home, dragged his body through the garage and placed it in the station wagon, then parked the car on the Lombard Street Extension and abandoned it by 10:45 p.m. on January 22. The state relied on the following physical evidence: the presence of blood spots on the bedroom walls; the pathologist's opinion that decedent's head had been resting against something soft and was probably immobile; and the presence of dirt on the back of decedent's shirt and pants which was very similar to that found on his garage floor.

---

[9] As best we understand the transcript, the state was contending at trial that the missing-person report the defendants claim to have seen taken at Denny's restaurant on January 22 was actually taken on *February* 8. However, in cross-examining Mrs. Davis, the waitress at Denny's restaurant, the district attorney, possibly mis-speaking himself, referred to *January* 8.

The state's own witnesses conceded that the blood spots found in the bedroom could not be determined to be human blood, nor did they indicate how long the spots might have been on the walls. They likewise conceded that the dirt found on decedent's clothing was of a type commonly found in any covered area where cars were often parked; that it was impossible to determine whether the dirt was under or on top of the blood on the clothing; and that there was no blood found on the garage floor.

This evidence, and likewise the pathologist's opinion that decedent's head had been immobile and on a soft surface when he was killed, while not inconsistent with the state's theory of the case, does not demonstrate guilt on the part of the defendants. It could as well demonstrate robbery-murder in the automobile while the decedent was heavily sedated by alcohol.

The remainder of the state's evidence was designed to prove that the defendants were lying and were, therefore, guilty of the murder of Joseph Voit. The defendants testified that they last saw the decedent alive very late on January 22, and that Mrs. Voit was driving the station wagon until after 11 p.m. These assertions contradict the testimony of Miss Schonert, who said that she saw the station wagon parked on the Lombard Street Extension by 10:45 p.m. Their testimony might also have been considered inconsistent with Dr. Lewman's opinion as to the time of death. Finally, the state's only rebuttal witness, Officer Houston, cast some doubt on the defendants' statements as to their whereabouts at 11 p.m.

Miss Schonert's opportunity for observation of the station wagon the night of January 22 was ad-

mittedly poor. The testimony of two other state's witnesses who passed the same place but did not observe the vehicle further weakens Miss Schonert's testimony.

Dr. Lewman's testimony was at best inconclusive. He could not place the time of death without knowing when strawberries were last eaten by the decedent. Mrs. Voit testified that after dinner the decedent had returned the remaining strawberries to the refrigerator where they were available throughout the evening. In arriving at his opinion that death occurred before 11:30 p.m., he found it necessary to accept some of Mrs. Voit's information, while arbitrarily rejecting the rest. He conceded that it was equally likely that decedent ate again after his evening meal, and that death occurred sometime after 11:30 p.m. The most that can be said for his testimony is that it, too, was equally consistent with the state's theory and with defendants' innocence.

The testimony of the state's rebuttal witness was offered to discredit that of the defendants and the manager and waitress from Denny's restaurant. The state's purpose in producing the officer was to show that no missing-person report had been investigated at Denny's restaurant on January 22. The officer's daily report sheet from January 22 indicates that he was busy elsewhere from 10:30 until after 11 p.m. It is not clear why the state failed to produce the police dispatch records for the night in question. The most that could reasonably be inferred from the officer's testimony is that *he* did not investigate a missing-person report at Denny's restaurant that night, not that one was not investigated.

■ In this case our function on review is to deter-

mine whether the evidence and all reasonable inferences therefrom are sufficient to support a finding of guilt. As we said in *State v. Jefferson,* 9 Or App 314, 319-20, 496 P2d 35 (1972):

> "In our review we do not weigh the evidence nor make judgments on credibility, nor are we concerned with conflicts in testimony. Our purpose is to determine whether the inferences which may be drawn from the evidence are sufficiently reasonable to support a jury verdict. The test set forth in *State v. Zauner* [250 Or 105, 441 P2d 85 (1968)], supra, is this: Where the evidence is entirely circumstantial, would a reasonable person, based upon all the evidence adduced in the case, be warranted in finding beyond a reasonable doubt that the defendant committed the offense charged?"

*See, State v. Wright,* 12 Or App 73, 75-76, 504 P2d 1065, Sup Ct *review denied* (1973).

The jury was entitled to believe the testimony of Miss Schonert, and to accept the opinion of Dr. Lewman as to time of death. The jury was entitled to believe that the defendants were lying about their activities and the activities of Joseph Voit at the time of death.

■ Since the physical evidence was equally consistent with guilt or innocence, the question, then, is whether proof of defendants' lying, without more, is sufficient to allow a finding of guilt beyond a reasonable doubt.

■ Evidence of false explanations by defendants is admissible as showing consciousness of guilt. *State of Oregon v. Kader,* 201 Or 300, 270 P2d 160, 174 (1954); *State v. Fong,* 211 Or 1, 19, 314 P2d 243 (1957). Consciousness of guilt, however, does not constitute affirmative proof as to how the crime was committed, or

defendants' participation therein. *See, State v. Crenshaw*, 6 Or App 55, 486 P2d 581 (1971). The state has proved that Joseph Voit was killed, and may have proved that defendants lied, but it has failed to show that defendants did the killing.

In denying defendants' motion for a judgment of acquittal, the trial judge said:

> "* * * And I tell you I didn't sleep very well last night, I was turning this case over in my mind, having a pretty good idea of what was going to happen. Without her [Miss Schonert's] testimony I might have been inclined to grant a Motion for a judgment for acquittal on the basis that on a purely circumstantial evidence case, that there were many hypotheses which were consistent with the innocence of these people. But with her testimony, if the jury wants to give her full credit, which can be done, the direct evidence of one witness who is entitled to full credit is sufficient to prove any fact under the Oregon system except in cases of perjury or treason. And with her testimony, I think the State made out a jury case * * *."

■ While we agree with the trial judge's assessment of the evidence, we disagree with his conclusion. It is true that only Miss Schonert's testimony created a clear issue of credibility. It is likewise true that passing on the credibility of witnesses is exclusively a jury function. But it does not follow that merely because a case contains a jury question the case itself is one for the jury.

■ Here, even if the jury resolved the credibility issue favorably to the state, the only fact proved thereby would be that defendants were lying. Such proofs cannot serve as a substitute for affirmative proofs that defendants committed the crime charged. On that essential point, our review of the record has

convinced us that there was insufficient evidence to support a finding of guilt.

Reversed.