Argued August 24, reversed November 5, petition for rehearing denied November 29, 1973, petition for review allowed February 12, 1974. See later issue Oregon Reports

STATE OF OREGON, *Respondent, v.* HAZEL KRUMMACHER (Nos. 16-049 and 16-050), *Appellant.*

515 P2d 412

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before LANGTRY, Presiding Judge, and FORT and THORNTON, Judges.

LANGTRY, P. J.

Defendant appeals from consolidated jury trial convictions of first degree murder of Dorothy and Herbert Krummacher, husband and wife, on or about November 19, 1968 in Oceanside, Oregon.[1] We conclude that the convictions must be reversed under the principles reviewed and enunciated in *State v. Voit/Strong,* 12 Or App 520, 506 P2d 734, Sup Ct *review denied* (1973). In order to explain this conclusion it is necessary to detail the extensive circumstantial evidence upon which the convictions were based.

Defendant was the wife of Martin Krummacher, son of the victims. The Martin Krummachers lived in Portland and the victims, Dorothy and Herbert, lived in Oceanside, Tillamook County, Oregon. Dorothy and Herbert were having trouble in their marriage and some evidence indicated they were preparing to separate. Evidence also indicated that Martin and de-

---

[1] Trial was had during February 1973, that is, more than four years after the crimes. The statute then but not now applicable in Oregon was former ORS 163.010 (1):

"Any person who purposely, and of deliberate and premeditated malice, or in the commission of or attempt to commit rape, arson, robbery or burglary, kills another, is guilty of murder in the first degree."

fendant were having marital and financial trouble. During the four years between the murders and the trial, they were divorced. It takes about two hours to drive an automobile between Portland and Oceanside. On Saturday and Sunday, November 16 and 17, 1968, Martin, the defendant, the defendant's two daughters, aged 11 and 14, and Martin's sister visited the victims at Oceanside. The victims regularly occupied a downstairs bedroom in their home. During the visit Martin and defendant slept in the right-hand upstairs bedroom, and the daughters and the sister occupied the left-hand upstairs bedroom which was separated from the other by the head of the stairway and a bathroom. A .38 caliber Ivar Johnson S & W handgun which Martin had purchased secondhand was taken on this trip. It had previously misfired and Martin had taken it to a gunsmith to be repaired and blued. The defendant had picked the gun up from the gunsmith prior to the trip but it had not been further test fired before the trip. There was conflicting evidence as to whether it was test fired before the trip, but it was not fired that weekend. The evidence was conflicting as to whether the gun was returned to Martin's home at the end of the trip. Defendant first told police officers that her daughter Arlene had taken it into the house at the end of the trip, but later admitted that this was not true; she contends that she made the statement because she was concerned about whether Martin still had the gun. Arlene did not remember whether or not she brought the gun back into the house or whether she even saw it again after their return. Arlene was only 14 at the time of the murders and, in the four years that had elapsed since then, she had apparently forgotten the details of the return trip from Oceanside. She did testify, however, that whenever Martin became angry

she would hide the bullets in the house. Martin's testimony was indefinite about whether the gun was taken into the house.

On Friday, November 22, when the victim Dorothy for several days had not been to her place of employment in Tillamook, a few miles distant from Oceanside, her employer obtained a deputy sheriff's help and went to the Oceanside home. Dogs were noted inside the home. There was no other response so they forced entry and found the body of Herbert, as ordinarily clothed, in the downstairs bedroom. He had been killed by one shot which had completely passed through his chest cavity. His face was covered with a wash cloth. The body of Dorothy was found on a bed in the left-hand upstairs bedroom. There was no evidence of a struggle in either place. Dorothy was clothed in a slip and other undergarments. She had been shot three times and later, during autopsy, one bullet was found lodged inside her; the other bullets had passed through her. Her face had been washed off (presumably of blood) down to the clavicle area. Her body was completely covered with a blanket. A nightgown and some other items of feminine clothing were on the toilet of the adjoining bathroom. Evidence was that Dorothy usually bathed early each morning in the upstairs bathroom.

No weapon was located and no empty shell casings or bullets were found anywhere except for the one lodged in Dorothy's body.[2] A metal detector was used in and around the house in the search for bullets.

---

[2] We do not find definite evidence in the record whether shell casings of fired bullets self-eject from an Ivar Johnson S & W .38 as it is fired.

A hole consistent with the size of a .38 slug, about ¾-inch deep, was found in a doorjamb downstairs but there was no bullet in it.

A fruit jar lid was under the bed where Dorothy's body was found and in the lid were burned matches and a cigarette butt of a nonfilter type which "possibly" had lipstick markings on it. None of the three females who had occupied that bedroom on the previous weekend smoked. Defendant smoked nonfiltered Lucky Strikes. Dorothy did not smoke and Herbert and Martin smoked various filtered brands. No evidence was introduced concerning any tests relating to the cigarette butt found in the jar lid. Dorothy's purse containing $140 in cash was in plain sight in the kitchen. Herbert's billfold was in the pants of a security guard uniform he wore in connection with his work. There was no evidence of forced entry or a theft about the premises. Several traces of blood and washed-out blood were found in various places around the house and a fingerprint of defendant was found on the outside door casing of the left upstairs bedroom. The telephone cord had been torn loose and then jammed back into position so that the telephone would ring but no voice transmission could occur on it. There were utensils on the kitchen stove consistent with a dinner's having been prepared but no evidence was introduced about food or traces of food thereon.

Two pathologists testified, one for the state and one for the defendant. The time of death is critical and the evidence about it is confusing. Dorothy's stomach was relatively full, showing that she had recently eaten peas and something like chicken and celery. Herbert's stomach was almost completely empty but contained some peas. There was advance decomposition of Dorothy's body and almost none in Herbert's.

The testimony of the state's pathologist was that in spite of these facts it was possible that both victims had died at near the same time. He said with reference to the time of death "that the maximum here would be somewhere around 72 hours; minimum, I'm sure at least 48 hours." The autopsies were performed in the early evening hours of November 22. The opinion of defendant's pathologist, based upon hypothetical questions framed from the results of the autopsies, was that Dorothy had been dead from two to three days while Herbert had been dead 24 to 30 hours. The pathologists generally agreed that factors such as the obesity of the victims, the temperature of the rooms in which they were respectively situated, the coverings over them, etc., could have had a bearing upon the conditions of their bodies which in turn formed part of the bases for their opinions about how long the victims had been dead. Both agreed it was obvious that Dorothy had recently before her death eaten a meal consistent with a lunch or dinner whereas Herbert's death occurred at least several hours after the eating of any ordinary meal.

On November 18, the day after the family trip to Oceanside, the defendant went shopping in Portland with credit cards belonging to Dorothy, which she said Dorothy had loaned to her for that purpose. She first used such a card at Penney's and then another card at a Lerner's shop. At Penney's she purchased some shoes for Arlene, signing Dorothy's name; at Lerner's she selected some dresses. The credit card tendered at Lerner's had expired and she signed Dorothy's name to an application for a renewal and said that after it was processed she would come back to pick up the purchases and the new card. She did not return. When first questioned by the police about this, she denied being in

Lerner's; at trial she admitted this was a lie. A short time after the discovery of the victims she testified she flushed all of Dorothy's credit cards down the toilet because she feared their possession would cast suspicion upon her.

On the morning of November 19 Martin left for his work which was connected with the installation of machinery. After the children were off to school defendant testified that she made a telephone call (about 9:15 a.m.) to Dorothy at Oceanside concerning some cloth that Dorothy wanted her to purchase. She testified that immediately thereafter she decided to go to Seattle seeking employment, in view of the fact that their family was in financial stress. She went to Seattle and there applied at several stores for a job as a meat wrapper. She testified she started back around 9 o'clock in the evening and that she arrived home at around 2 a.m. and immediately went to bed, telling Martin where she had been. Martin testified that she returned around 4 a.m. After she had described the places where she had applied for work in Seattle, investigating police were able to find only one person who definitely recalled seeing her and he was not sure whether she was there on the 19th or the 20th. Payroll records for this witness from the Safeway office in Seattle were indefinite but would support an inference that the date was November 20. While a detective was investigating at the store where this witness worked, defendant, Martin and defendant's father came into the store and were observed talking to this witness by the detective. Defendant testified that at that time she obtained a written statement from the employe (which she was unable to produce), saying she was there on the 19th; but the detective testified that as he observed her he did not see her obtain such a statement. She told the

detective that while she was in Seattle she called a Dr. Teien in Poulsbo, Washington but when the detective checked with him he denied he had received such a call and she admitted later that she had lied in this regard to the detective. There was other evidence that defendant tried to make evidence bolstering her assertion of having made the Seattle trip on the 19th.

Defendant testified that she went job hunting in Portland on November 21 and 22. Martin went to work as usual. Defendant during this time attempted to negotiate a $2,500 loan at a finance company in order to consolidate family debts but was unsuccessful. No other corroborating evidence as to the whereabouts of either defendant or Martin during the time between the 19th and the 22nd was introduced. Martin had returned from work on November 19 at around 5:30 or 6 p.m., which was verified by the daughter Arlene but no corroboration of his whereabouts at other times on November 19 was introduced.

At a joint funeral for the victims defendant was heard to have said over the coffin of Herbert " 'I hate you. I hate you. I hate you.' " She testified in explanation of this that she believed Herbert had killed Dorothy with whom she was very close.

One Oceanside neighbor of the victims testified that around 10 p.m. on either November 19 or 20 she heard a shot from a revolver larger than a .22 and shortly thereafter something bumped the side of her house, agitating her dog very much. She did not know what it was. No one else testified to hearing any shots. Another neighbor couple testified that on the night of November 19-20 they came into their house at about 11:30 p.m. They noticed that lights' were on at the victims' home, and that Herbert's Volkswagen was

parked parallel to the house, and that another car which looked familiar to them but which they did not further identify was parked in front of the house. They particularly noted the parallel parking of Herbert's car because he usually parked vertically near the back porch. The next morning (November 20 at about 10 o'clock) they noticed that Herbert's car had been moved into its usual position. These neighbors went to Portland that morning and as they left they noted Herbert had not raised the American flag on his flagpole which he usually did in the mornings. The second car was still in front of the house when they left. Evidence in the form of a picture of the scene indicates that what may have been the other car was moved from in front of the house to the side of the house after these witnesses left.

The defendant lied about several things, and each lie has a tendency to incriminate her in some respect. There has been little showing of motive for the defendant to have committed the murders. If there was motive in the misuse of the credit cards which defendant said Dorothy loaned to her to use, it is somewhat dispelled by the fact that the $140 cash in Dorothy's purse was undisturbed; if there was motive in the expression of hatred for Herbert, it does not explain the death of Dorothy at the hand of this defendant. Defendant was in Seattle either on November 19 or 20 but this is not wholly inconsistent with the ability of a person to also drive from Portland to Oceanside and back within the indefinite period when the victims might have been killed.

An expert witness testified that the bullet taken from Dorothy's body was from a .38 Ivar Johnson S & W gun. That describes Martin's gun. When the

police asked him to produce the gun, he could not find it, and it was never found. Martin did produce the box of shells he had for the gun. An expert for the state performed neutron activation analyses of parts of the death bullet, bullets from the box, and bullets from four lots of similar bullets obtained at random from various places in Washington, Oregon and California. The purpose was to show whether the death bullet was from the same batch of metal as those in Martin's box, which would have been available to defendant. The best the expert could say was that it was "possible" they were of the same batch and it was not from the random samples. Defendant claims it was error to allow this evidence. This is a question we need not decide, for even with this evidence, we conclude all of the evidence does not support the verdicts.

■■ In *State v. Voit/Strong,* 12 Or App 520, 506 P2d 734, Sup Ct *review denied* (1973), we repeated the test stated in *State v. Zauner,* 250 Or 105, 441 P2d 85 (1968):

> " '* * * Where the evidence is entirely circumstantial, would a reasonable person, based upon all the evidence adduced in the case, be warranted in finding beyond a reasonable doubt that the defendant committed the offense charged.' " 12 Or App at 532.

This is the test that we use in determining whether there is evidence sufficient to support jury verdicts of guilty. In *Voit/Strong* the state sought to prove the defendants were lying and that their lie was a basis for the finding of guilty. We said:

> "* * * [I]f the jury resolved the credibility issue favorably to the state, the only fact proved thereby would be that defendants were lying. Such proofs cannot serve as a substitute for affirmative

proofs that defendants committed the crime charged. On that essential point, our review of the record has convinced us that there was insufficient evidence to support a finding of guilt." 12 Or App at 533-34.

In deciding the defendant's motion for acquittal in the case at bar the trial judge considered *State v. Carroll*, 251 Or 197, 444 P2d 1006 (1968). In that case the court held that where the defendant testified falsely on two material issues of fact the falsehood displayed a consciousness of guilt and supported the finding against him. We note that in *Howard v. Sloan*, 264 Or 247, 256-57, 504 P2d 735 (1972), concerning *Carroll* the Supreme Court said that there

"* * * the issue was not whether false testimony would of itself be sufficient to support a finding that defendant was guilty of the crime charged, but whether it was sufficient to satisfy the requirement that when, as in that case, testimony of guilt was supplied by an accomplice there must be some corroboration of such evidence.

"The general rule, of course, is that the fact that a defendant lies does not, taken by itself, prove that he is guilty. See 1 Wharton, Criminal Evidence (12th ed 1955) 268, § 143 * * *." (Footnote omitted.)

In the case at bar the state has produced no evidence which places the defendant at the scene of the crimes at or near the time when they necessarily must have occurred. She was no more tied to what possibly was the murder weapon than were others. The single fingerprint of the defendant upon the door upstairs in the house is entirely consistent with her having been in the house the weekend preceding the murders. There was evidence that no smoking occurred on the previous weekend in the bedroom where Dorothy's body was

found. The finding of the burned cigarette there after Dorothy's death, if the cigarette could have been tied in someway to the defendant, might have been some such evidence but nothing to that effect was introduced. From our review of the entire record we can only conclude that the verdicts of guilty were based on speculation and conjecture growing out of the defendant's lying and inability to make a reasonable accounting of her whereabouts during the period of time the murders must have occurred.

Reversed.

FORT, J., dissenting.

As the majority opinion makes clear, this is indeed a difficult case. I can say only that in my opinion there was sufficient evidence introduced, as outlined in the court's opinion, to warrant the submission of the charge to the jury. Accordingly, I dissent from the court's conclusion that the evidence introduced (without regard to its admissibility) was insufficient as a matter of law to warrant the defendant's conviction.