Argued and submitted March 17, reversed and remanded
with instructions July 21, reconsideration denied October 2,
petition for review allowed December 9, 1980

# HAZEL KRUMMACHER,
*Appellant,*

*v.*

# GIERLOFF,
*Respondent.*

## (No. 103613 Post Conviction, CA 13105)

614 P2d 109

William J. Tway, Boise, Idaho, and Dale Drake,
Salem, argued the cause for appellant. With them on
the brief were Anton Hohler and Faber F. Tway, Boise.

James M. Brown, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Warden and Warren, Judges.

SCHWAB, C. J.

**SCHWAB, C. J.**

Petitioner appeals from the trial court's denial of relief in this post-conviction proceeding.

In 1973, petitioner was convicted of first degree murder (former ORS 163.010) for the 1968 killings of her father-in law, Herbert Krummacher, and her mother-in-law, Dorothy Krummacher. By a bare majority, the convictions were reversed by this court on the ground that there was insufficient evidence of guilt to submit to a jury. *State v. Krummacher,* 15 Or App 234, 515 P2d 412 (1973). The Supreme Court allowed the state's petition for review and, with three of its members dissenting, reversed the decision of this court and affirmed the trial court's judgment of conviction. *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974). The known facts are set forth in detail in the cited opinions. For present purposes, it is sufficient to say that the evidence of guilt was far from overwhelming.

In the present proceeding, petitioner makes a multitude of contentions, only one of which we need reach — that she was denied the effective assistance of counsel at her murder trial by reason of her attorney's failure to offer available documentary evidence or to adequately examine medical witnesses in connection with petitioner's theory that Herbert Krummacher killed his wife and then took his own life. We agree with that contention, and we therefore order a new trial. [1]

The autopsies on the victims were performed by Dr. Russell Henry. Copies of the autopsy reports were given to petitioner's attorney prior to trial. The report on the autopsy of Herbert Krummacher states

---

[1] Petitioner's assignment of error does not set forth all of the particulars upon which her contention depends. Nevertheless, because the substance of the contention is made clear in the argument in petitioner's brief, we will consider it.

that "[t]here is a contact ring * * * and an impression of powder staining" in the area of the fatal wound, indicating that the victim was shot at very close range.

Dr. Henry was called as a prosecution witness at petitioner's murder trial. Petitioner's defense attorney did not question him regarding the contact ring or powder staining in the area of Herbert Krummacher's wound, nor did the attorney offer the autopsy report as evidence. Between the time Henry performed the autopsies in 1968 and the time of the 1973 trial, he had moved from Oregon to Virginia. At the conclusion of Henry's testimony, the defense attorney agreed that Henry could be excused to return to Virginia.

Later, the attorney called Dr. William Lehman, a pathologist, as a defense witness. On direct examination, Lehman testified:

Q "What can a forensic pathologist determine, if anything, by a test for powder burns?

A "Well, if there are blackish marks on the body, it would mean that the gun, generally speaking, of course, we are speaking in generalities, it would mean that the gun was close enough, the muzzle of the weapon was close enough to the body so that the discharge of powder with the bullet would be carried up to and against and penetrate the skin of the body. That would give the investigating pathologist some idea, or the investigating authorities, the Police Department, give them at least some idea of how far the muzzle was from the body. These laboratory people then would, if they have the weapon, would fire the weapon at a certain distance and see if they could repeat the pattern of the powder burns on an object at definite distances from the muzzle of the weapon.

Q "And what could — might this give them proof of, or evidence of?

A "It would indicate that if there were powder burns on the body, it would mean that the gun was close by, but if there were no powder burns, it

would be an indication, a strong indication, at least, all other things being equal, that the muzzle was too far away for that person to have used the gun on himself or herself, for example.

Q "Now, are you also familiar with the investigative technique used by forensic pathologists in connection with primer residues, which deposit themselves on the hands of a person who has fired a weapon?

A "Yes. I must tell you that I don't do these things myself. There is a laboratory, crime institute that takes care of this, but paraffin is used. It is not always considered a reliable procedure, to be frank. But, here again, this is resorted to to either prove or disprove that a suspect may have fired a weapon, because if there is no evidence of any powder residue on his hand as indicated by the test, then at least this is some evidence that he wasn't involved in the situation.

Q "Does this type of test have any applicability where you find some one or two individuals dead, and there's a question of whether there's a suicide involved?

A "Yes, particularly in the autopsy report on Herbert Krummacher, the forensic pathologist —"

The prosecuting attorney intervened at that point, stating:

"Wait. Excuse me, Doctor. I don't believe that report is in evidence. I don't recall counsel asking Dr. Henry any questions regarding powder burns when he examined Dr. Henry, and it is not appropriate or proper for counsel to allow the witness to testify to an opinion based upon evidence not shown."

The court agreed that the witness could not testify about the contents of the autopsy report. The defense attorney then resumed his questioning:

Q "Doctor, we will not go into the autopsy report. Just tell us, what do you — what assistance can this test be in determining whether or not there is a suicide, if it can be of any assistance at all?

A "Well, presuming that — presuming that, in general, supposing that a situation has arisen in which the autopsy pathologist, whoever he may be, has found a certain kind of evidence on the body, a ring type of situation, there is always the suspicion that this ring may have been produced by the circular design of the muzzle of the weapon. Now, if such a ring is present on a body, any body, — any body examined in an autopsy, then any suspect should have that — his hand examined to see if there are residue powder particles on the hand, because if they are not there, then that individual had nothing to do with the contact point, and that person can be either ruled in or ruled out, depending upon the circumstances. Do I make myself clear?

Q "Okay. And can you do this with the victim himself or herself?

A "Of course, of course.

Q "And what will that show?

A "Well, if a victim, any victim, has such a circular ring indicating the size and the shape of a weapon muzzle —

Q "I think you misunderstood me. Can you put it — do this powder — primer residue test on the hands of a victim for any purpose?

A "Yes, if the powder residue is on the hand of the victim who also has the ring, then it is very possible that that person committed suicide. Is that what you're trying to get at?

Q "Yes, thank you. * * * "

The combination of the defense attorney's examination of the expert witnesses and his failure to introduce the autopsy report on Herbert Krummacher had two effects: first, the jury was informed that, in the abstract, a certain type of autopsy finding is *suggestive* of suicide; and second, the jury was *not* informed that exactly such a finding was made in the autopsy performed on Herbert Krummacher.

At the post-conviction hearing, the defense attorney testified, in essence, that he chose not to emphasize the murder-suicide theory in presenting

[124]

his case because of the theory's inherent weaknesses. There was evidence which tended to controvert the likelihood of murder-suicide. The murder weapon was not found in the house where the killings occurred; two of the three bullets which were fired, and all of the spent shells, were also missing; and the body of Herbert Krummacher was found with a towel over the face. Moreover, the angle of Herbert Krummacher's wound was not suggestive of suicide. The shot entered his body on the right side of his chest, slightly above the nipple, and followed a fairly straight, downward path, exiting from the back.

It cannot be said, however, that suicide was impossible. There were green peas in the stomachs of both victims, supporting an inference that they ate simultaneously. The stage of digestion was such that it is likely Dorothy Krummacher died very shortly after eating and Herbert Krummacher died approximately three hours after eating. Dorothy Krummacher died almost instantly after being shot. According to the defense pathologist, Herbert Krummacher could have survived for as long as fifteen minutes after he was shot, and could have engaged in physical activity during part of that time. In sum, there was evidence from which the jury could have found it possible that Herbert Krummacher shot his wife, then shot himself at some later time, and then disposed of the gun and ballistics evidence. The jury could also have found it possible that, during the two to three day period which elapsed between the deaths of the victims and the discovery of their bodies, a third person entered the house and removed the missing bullets and the gun with which Herbert Krummacher shot his wife and himself.

In keeping with his view that the murder-suicide theory was a weak one, the defense attorney placed equal or greater emphasis on other defenses. Nevertheless, he did adduce evidence, principally through the testimony of Dr. Lehman, aimed at

proving murder-suicide. In his closing argument, he commented on the state's failure to cause a paraffin test to be performed on the hands of Herbert Krummacher to determine whether he had fired a gun. The autopsy report prepared by the state's pathologist was the strongest available evidence disclosed in the murder trial or post-conviction records to support a finding of murder-suicide. The attorney did not introduce it or elicit the relevant facts from the state's pathologist on cross-examination.

In *Rook v. Cupp,* 18 Or App 608, 526 P2d 605, *rev den* (1974), we held that the standard to be applied in post-conviction proceedings where relief is sought on grounds of ineffective representation of counsel is one which " * * * brings into consideration counsel's skills as a lawyer and applies a test of reasonableness under the circumstances." 18 Or App at 613. We also noted in *Rook* that " * * * if any shown incompetence had no effect on the outcome of the case, it will be treated as harmless." 18 Or App at 613.

We conclude here that the defense attorney's failures to introduce the autopsy report on Herbert Krummacher and to examine the state's pathologist about the contact ring and powder stains which he had observed in the area of Herbert Krummacher's wound were not reasonable under the circumstances.

We also conclude that counsel's ineffectiveness could have affected the outcome of the case. For reasons we have noted, the jury might well have found that, whatever the evidence in its favor, the evidence controverting the murder-suicide theory was so persuasive that the theory could not be believed. However, the jurors could also have reasoned differently. As noted, the evidence which was not introduced was the strongest available evidence of murder-suicide. Of equal significance, the testimony of Dr. Lehman spelled out in detail why certain autopsy findings could, *in the abstract,* be indicative of suicide.

[126]

The jurors *could* have reasoned that, if such findings were present in the case before them, that fact would have been made known to them. Stated otherwise, the defense attorney's handling of the witnesses and the evidence might have convinced the jury that, notwithstanding the references to suicide in the testimony, there was no evidence of suicide in this case.

In any event, petitioner was not obliged to prove that murder-suicide occurred. The question is whether there was a significant possibility that the evidence which her attorney failed to produce at the murder trial — in this case where the evidence of guilt was so unimposing — could have caused the jury to travel the possibly small distance from its finding of guilt to a finding that reasonable doubt existed. We conclude that the answer to that question is yes.

Reversed and remanded with instructions to grant a new trial.