Argued March 12, reversed June 27, petition for rehearing
denied July 30, 1974

## STATE OF OREGON, *Petitioner, v.*
## HAZEL KRUMMACHER, *Respondent.*

### 523 P2d 1009

*Thomas H. Denney,* Assistant Attorney General, argued the cause for petitioner. With him on the briefs were Lee Johnson, Attorney General, John W. Osburn, former Solicitor General, and W. Michael Gillette, Solicitor General, Salem.

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed a brief for respondent.

HOLMAN, J.

Defendant was convicted of the first degree murder of both her mother-in-law and her father-in-law. She was separately charged with each of the crimes but they were consolidated for trial. She appealed the convictions, and the Court of Appeals reversed the trial court and set aside the convictions on the ground that there was insufficient evidence of defendant's guilt to submit to the jury. 15 Or App 234, 515 P2d 412 (1973). This court granted review.

The State's case was based entirely on circumstantial evidence. No witness was able to place the defendant within a hundred miles of the scene of the crimes at or about their time of commission. Much of the testimony is in dispute. Because the evidence was circumstantial in nature, its narration is, of necessity, voluminous. Defendant was a young woman in her early thirties. She was married to Martin Krummacher, the son of the two victims. She had two daughters. At the time of the crime, one was eleven and the other was fourteen years of age. The elder of the children was defendant's child by a prior marriage. The parental status of the younger child is not clear. Both children were attending school and lived with the defendant and her husband in Portland. Defend-

ant was not employed. Her husband installed and repaired plywood manufacturing machinery which work took him to the location of various mills. The family had money difficulties.

The victims were Herbert and Dorothy Krummacher, 65 and 58 years of age respectively. They lived at Oceanside, near Netarts, on the Oregon Coast, about two hours' drive from Portland. Dorothy worked regularly in a store and Herbert worked as a security guard at a mill. While the evidence is subject to various interpretations, it is ample for the jury to find, and the State contends, that they died during the evening of Tuesday, November 19, 1968, or early in the morning of Wednesday, November 20. Dorothy did not appear at work that morning nor did Herbert put out the flag at their home as he customarily did.

Their bodies were discovered during the afternoon of Friday, November 22, when a sheriff's deputy went to investigate at the request of Dorothy's employer. The house was locked and a screen door and a pane in the upper part of the rear door had to be removed so that the deputy could unlock the door from the inside. Herbert was found in the sole downstairs bedroom, lying on the floor on his back, between his wife's bed and his own. His face was covered with a towel. Dorothy was found on a bed in one of the two upstairs bedrooms covered with a blanket. Her face and neck appeared to have been washed of blood down to the clavicle after she was killed. A washcloth found near the body showed evidence of blood, though the traces remaining were so small that they could not be identified as human blood.

Herbert was shot through the chest, the bullet having exited his body from the rear. The principal artery to a lung was severed, and he bled to death

internally into his lung cavity. He could have lived and walked about some minutes after he was shot. Dorothy had three wounds. Two were in the middle chest and she must have died very quickly. One bullet exited through her back, but the other did not and was found lodged in her spine. The third wound was in her forearm which was shot through (probably by the bullet found in her spine). No powder burns were found on the clothing of either victim.

No bullets or empty casings were found other than the bullet lodged in Dorothy's body. There was a bullet hole in a door casing in the kitchen which fitted a .38 caliber bullet, but no bullet was found in the hole. Extended searches were made for the bullets. At least three shots had to have been fired: one into Herbert and two into Dorothy. Other than the pool of blood in which Herbert was lying and the blood on the bodies and their clothing, there was surprisingly little evidence of blood throughout the house. There was one discernible smear, which appeared to be blood, on the wall of the stairs which could have come from the side of a hand. There was evidence of blood about the upstairs washroom basin and on the inside of both the front and back doors. However, the amounts were so insignificant that there was insufficient blood from which to determine the kind or type. Dorothy had eaten about one hour before her death; Herbert about three hours before his death. Two buttons were off of Dorothy's jacket. One was lying on the bed on which she was found and the other in the folds of her clothing. Under this bed there was a lid with some burnt matches in it and a non-filter cigarette butt with some lipstick on it. Dorothy did not smoke. The cigarette butt had no brand name on it. Defendant smoked non-filter Lucky Strikes.

There was no sign of any protracted struggle. Dorothy's glasses were found on the floor of the living room. The legs of the glasses appeared to have been chewed. There were two small dogs in the house. A chain to go around the neck which was attached to the legs of the glasses and which was of small beads had been broken, and the beads were found on the living room floor and on the front porch. Dorothy's purse was on a chair in the dining room and there was $140 in cash in it. Herbert's billfold was found in the pants of a uniform. There was no money it it. There was a telephone on the wall of the downstairs hall. The cord running from the box to the receiver and transmitter had been jerked from the box and the broken end of the cord had been reinserted in the box from which it had come to make it look normal. There was no evidence of a forced entry into the house.

A neighbor who arrived home at 11:30 in the evening on Tuesday the 19th observed that the lights were on in the Krummachers' house. The neighbor retired about 1 a.m. and saw or heard nothing unusual during this time. When the neighbor left the next morning she observed that a Volkswagen usually driven by Herbert had been moved since the time of the neighbor's arrival the night before. Another neighbor testified she heard a gunshot about 10:30 in the evening on the 19th or 20th and about ten minutes later there was a bump on the side of her house and her dog become excited. She let the dog out but did not go out herself.

On the previous weekend the defendant, her two children, her husband, and her husband's sister, Cathy, had visited the victims. They had arrived Saturday evening, November 16, and left in the afternoon of

Sunday, November 17, after staying overnight. On the trip the defendant's husband took with him an Ivar Johnson .38 caliber revolver, Smith and Wesson type. It was not used on the trip. Defendant's elder daughter testified she saw her father unload the gun after they returned to their home in Portland. Defendant told the police that her daughter had taken the gun into the house upon their return and her husband had unloaded it. However, at trial she claimed she had lied about the matter to the police and testified she did not know whether the gun was taken into the home upon their return or not. She said her husband usually packed this revolver in his car. She claimed she had lied to the police because she was afraid of implicating her husband.

After the bodies of the victims were discovered, the revolver was searched for but has never been found. The bullet which was taken from the body of Dorothy, because of the rifling marks upon it, was identified by an expert as having been shot from an Ivar Johnson .38 caliber Smith and Wesson type revolver. This make of gun was not popular. There have been about forty different recent manufacturers of .38 caliber handguns, about four of which now manufacture the .38 caliber Smith and Wesson type. Ivar Johnson manufactured about ten per cent of the Smith and Wesson type, or about 150,000 guns since 1853. It ceased manufacture of the gun twelve years before the crimes in question and only recently recommenced. The deceased, Herbert Krummacher, was not known to have owned or possessed a gun of any kind.

The bullet found in Dorothy's body was identified as being a .38 caliber lubaloy copper-washed Smith and Wesson type bullet manufactured by the

Western Company, which went out of business three years prior to the crimes in question. The State produced an expert in neutron activation analysis. His purpose was to demonstrate whether it was possible that the fatal bullet came from the same batch of metal as some similar bullets which were in a box in defendant's home. He put the bullet which was recovered from Dorothy's body in a cyclotron to make it radioactive for the purpose of identifying any trace mineral elements of arsenic, antimony, copper, tin or silver which might be in the lead. He then similarly analyzed the lead from bullets in the box in defendant's home. He also analyzed the lead from five other groups of similar bullets by the same manufacturer which were acquired with considerable difficulty—from Tacoma, Washington, from Redding, California, from a bullet collector, and from other sources—because of the rareness of the bullet.

The average of each element in the bullets in each group was established so that those averages could be compared with the trace elements present in the fatal bullet. The analyses showed that the bullet *could have* come from the same batch of metal as the group of bullets which was taken from defendant's home but not from the same batch as any of the other groups. It could not be determined that the bullet had come from the same batch of metal as the group in defendant's home, only that it was *possible* that it could have.

The analyses were properly criticized by defendant's expert who pointed out that the individual bullets in each of the groups with which the fatal bullet was compared were not shown to have come from the same manufacturer's batch, and that for all that

was known each group of bullets tested could have been made up of bullets from different manufacturers' batches. If all bullets in each group did not come from the same manufacturer's batch and if each group did not come from a different batch, the averages established for each group did not mean anything and they did not form true groups for identification purposes. Assuming that each group represented a different manufacturer's batch, defendant's expert also criticized the analyses because there was no information concerning how many batches of similar bullets were manufactured by the Western Company in the years immediately prior to going out of business in 1965. As a result, there was no way to say whether the six groups (if they represented six batches) represented an adequate cross-section of all batches from which the fatal bullet might have come. The testimony concerning bullet comparison was admitted over defendant's objection that there was no adequate basis for such a comparison.

Defendant testified that on Monday, the 18th, she bought a pair of shoes at Penney's for one of her daughters and a sweater for her husband's sister, Cathy, with Dorothy's credit card, which Dorothy had given her for that purpose. She also went to Lerner's, a ladies' wear shop, and presented Dorothy's credit card for the purchase of a dress and some other articles for herself. She admits that these purchases were not authorized by Dorothy. The card she presented had not been used for two years and the shop would not honor it without first checking the credit and receiving a new application. Defendant made a new application in Dorothy's name and was told to return in about 15 minutes. Defendant said she would go out and get a cup of coffee and return. Both the woman who

waited on defendant and the woman who handled the credit testified the defendant never returned to pick up her purchases.

Defendant testified she thought about her purchases while she was drinking her coffee and decided she could not afford them. She claimed she went back and told the saleslady why she could not complete the purchase. She did not pick up Dorothy's old credit card. She admitted she denied to a detective that she had been at Lerner's when she was questioned concerning it. She said she had some other credit cards of Dorothy's which Dorothy had given her which she flushed down the toilet after the bodies of her mother-in-law and father-in-law had been discovered. She said she did it because she had become frightened.

Representatives of the telephone company testified that on Tuesday, November 19, shortly after 9 a.m., a telephone call was made from the Martin Krummacher home in Portland to the Herbert Krummacher home at Oceanside. Defendant testified she placed the call for the purpose of talking to Dorothy about some cloth Dorothy wanted defendant to buy for her.

On Tuesday evening, November 19, when defendant's children returned from school and her husband returned from work, they found defendant gone. She did not return until 4 o'clock in the morning on Wednesday, November 20. When her husband inquired where she had been, she told him she had gone to Seattle to look for work as a meat wrapper. Her elder daughter testified she found a note from defendant saying she had gone to Seattle and telling her what to prepare for dinner, but the child testified she did not tell her stepfather about it. She said they looked for the note after they heard of their grand-

parents' deaths and the note was found. She did not know by whom it was found. She said they also looked for a Seattle Times newspaper and this was eventually found. Neither the note nor the newspaper was ever produced at trial. Defendant testified they were found but they disappeared. The child's testimony was not convincing.

Defendant's sister-in-law helped defendant look for the newspaper and they found a fragment of a newspaper with the letters "imes" inscribed on it. The fragment had no date on it. However, it had two telephone numbers written on it, and the sister-in-law remembered them and told the police of them. A police officer testified he called the numbers in Seattle and no one at either number knew defendant. The sister-in-law testified defendant purported to find and exhibited to her a note on an envelope which she had purportedly left for her children when she went to Seattle. As previously stated, this note was not produced by the defendant at the time of trial.

The State produced two employees of Safeway Stores from Seattle who identified defendant as having come in the afternoon to the store where they were working, asking for employment. The employee whom defendant originally contacted took her to the other who was the assistant manager. They both testified that she was interviewed by the assistant manager because the manager was off that afternoon and that they knew that it was Wednesday afternoon rather than Tuesday because Wednesday was the manager's day off. They did not know which week of the month it was, but it was in November sometime prior to Thanksgiving. The time records of Safeway were produced showing that both employees were at

work on Wednesday of the week of November 17 and the employee she originally contacted who took her to the one who was the assistant manager was off a half day on Tuesday of that week.

An employee of another Safeway store testified that he had talked to defendant about a job and had given her an application to fill out. He said she came back on another day and asked him to sign a statement saying she had originally talked to him on a certain day and he told her that he did not remember which day she had been there but that he would sign it for her and he did so. The defendant denied remembering ever having seen any of the three Safeway store employees who testified, though she said the one who testified he gave her the statement looked slightly familiar. Defendant testified she went to Seattle with her husband and father and contacted two people who had seen her on the 19th and who signed a statement to that effect. She did not produce the statements nor the people. She said she gave the statements to a police officer who was investigating the deaths, but the officer in question testified she did not give him any such statements. She testified she did not remember who the people were and made no effort to locate them again after she gave their statements to the officer.

Defendant also told the police that while in Seattle she had called a Dr. Teien. The police called Dr. Teien and confronted defendant with Dr. Teien's denial of any such contact. Defendant then, and also while on the witness stand, admitted she had lied about the call.

On Thursday, November 21, defendant went to Granning & Treece, a loan company, and attempted to borrow $2,500 but was turned down. She testified she

made the application because she wanted to consolidate the family bills. She did not tell her husband in advance that she was going to try to borrow the money but claimed she told him about it afterward. The husband denied she so told him and testified that they already had a loan at Granning & Treece. The husband admitted that defendant usually took care of the family finances.

At the funeral for Dorothy and Herbert, defendant was seen to stand over her father-in-law's casket and to say, "I hate you, I hate you, I hate you." Defendant admits this and testified she did so because she thought Herbert had killed Dorothy.

Dorothy and Herbert did not get along well together. Also, the defendant and her husband were divorced between the death of her husband's parents and the defendant's trial, which was four years after the killings. The defendant testified that Herbert had made ineffectual advances toward her which she had easily repulsed and about which she told her husband, who talked to Herbert and that was the end of such difficulty.

■■ Admittedly, all of the incriminating evidence is circumstantial. In deciding whether the circumstances are sufficient to entitle the jury to find beyond a reasonable doubt that defendant was guilty, we must remember that it is not proper for us to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilt, or in deciding whether the case should be submitted to the jury, such conflicts must be treated as if they had been decided in the State's favor. After the conflicts have been so decided, we take such decided facts together with those facts about which there is no conflict and determine

whether the inferences that may be drawn from them are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt. *State v. Zauner,* 250 Or 105, 110, 441 P2d 85 (1968) ; *State v. Dennis,* 177 Or 73, 78, 159 P2d 838, 161 P2d 670 (1945). Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury to so find. *State v. Zauner, supra.*

Through the years much has been made by defendants of the language which is found in *State v. Dennis, supra* at 77, concerning circumstantial evidence. The statement is to the effect that the evidence upon which the State relies for conviction must not merely coincide with, render possible, and be consistent with the guilt of the accused, but it must be inconsistent with any reasonable theory of his innocence and incapable of explanation on any other rational hypotheses than that of guilt. The rule of *Dennis* is one of general application in a majority of jurisdictions. However, some courts indicate that the *Dennis* standard is for the jury to apply and that a jury conviction based on circumstantial evidence will not be set aside unless the record shows that upon no hypothesis is there sufficient evidence to convict. In *People v. Jones,* 232 Cal App 2d 379, 388-89, 42 Cal Rptr 714, 720 (1965), the court said:

"* * * The rule that circumstantial evidence must be consistent with guilt and inconsistent with any reasonable hypothesis of innocence, is a rule of instruction for the guidance of the jury. * * * After conviction, all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatever is there sufficient substantial evidence to support it * * * [citations omitted]."

While some courts are not entirely clear, they seem

to reject the *Dennis* rule. In *Holland v. Commonwealth,* 323 SW2d 411, 413 (Ky 1959), the court said:

"* * * It is not required, in order to sustain a conviction based on circumstantial evidence, that the evidence be such as to exclude every possibility of the defendants' innocence; it is sufficient if all of the circumstances, when considered together, point unerringly to the defendants' guilt. * * * It is our opinion that the evidence here was not as consistent with innocence as it was with guilt, and that it fairly and reasonably connected the defendants with the commission of the crime. Accordingly, we hold that the evidence was sufficient to sustain the conviction [citations omitted]."

1 Wharton's Criminal Evidence 18, § 12, has the following to say about the *Dennis* rule:

"In some states, particularly where the only evidence is circumstantial, it has been stated that proof beyond a reasonable doubt must exclude every reasonable or rational hypothesis other than guilt. This instruction should not be regarded as establishing a standard more severe than the usual concept of reasonable doubt * * *."

■ It is our conclusion that *Dennis* does not mean, as it appears to say, that every rational hypothesis must be excluded. It simply means that circumstantial evidence, like direct evidence, must indicate guilt to the extent that there is no reasonable doubt of that conclusion. In deciding whether a jury issue exists, *Dennis* requires only that the inferences of innocence be considered that may be drawn from the facts in evidence (as found in the State's favor) or from the paucity of such facts, and if they are sufficient to create a reasonable doubt, the case may not be submitted to the jury. The language of the *Dennis* decision seems to recognize this because it also says:

"* * * This does not mean that all of the testi-

mony must be consistent with the guilt of the defendant. The testimony may be conflicting, yet the facts proved may warrant a verdict of guilty upon circumstantial evidence alone." 177 Or at 77-78. Also see *State v. Harris*, 241 Or 224, 232, 405 P2d 492 (1965). At best, the enunciation of any rule concerning what constitutes a reasonable doubt, whether in a circumstantial or direct evidence case, must be in very general terms and is extremely difficult of application.

Facts which the jury could find and from which the strongest inferences of guilt may be inferred are as follows:

1. Defendant had access to an uncommon kind of firearm which was the kind of firearm with which Dorothy was killed.

2. Defendant had access to an uncommon kind of bullet which was the kind of bullet with which Dorothy was killed.

3. The firearm to which defendant had access disappeared at or about the time of the murders.

4. Defendant's husband, who was the other person who had access to the firearm and the bullets, did not commit the crimes or dispose of the gun.

5. The killer was known to the victims because of the manner in which the bodies were treated and the apparent absence of robbery as a motive.

6. Defendant disappeared without prior notice to her family at the time the crimes were committed.

7. Defendant lied about where she was during her absence and attempted to establish a false alibi.

8. Though defendant was absent about 18 hours, she was unable to produce anyone who could verify her whereabouts during that time.

9. Because of the towel over Herbert's face and the lack of powder burns on his clothing, he could not have killed himself after first killing Dorothy.

On the other hand, inferences of innocence may be drawn from the following facts:

1. No one can place defendant within a hundred miles of the scene of the crimes. There is no evidence of anyone seeing a motor vehicle resembling defendant's at Oceanside or on the route to or from Portland.

2. There is no satisfactory explanation of what appears to be a two-hour difference in the time of the deaths of the two victims, assuming that they ate at the same time, which is not an unreasonable assumption.

3. There is an absence of anything in the background of the defendant and the victims which would generate a sufficient motive on defendant's part for the killings.

4. Collecting spent bullets, including digging them from woodwork, has a professional, unhousewifely air about it.

5. Dorothy's body must have taken some handling after her death because there was no indication she was killed on the bed on which she was found. The killer's clothes must have had some contact with blood, yet there was no evidence of defendant's having any cleaning done or disposing of any of her apparel.

6. It is obvious the defendant had been in Seattle at some time not too distant from the killings, yet the State offered no evidence of knowledge on the part of the members of her family of her absence at any other time.

■■ The weakest part of the State's case is its failure to prove a substantial motive for defendant to kill the victims. Defendant certainly expressed animosity toward her father-in-law as she stood over his casket at the funeral, but she gave a logical explanation when she said she thought he had killed his wife. While, in retrospect, because of the towel over Her-

bert's face and the lack of powder burns on his clothing it seems clear that he did not kill himself and, therefore, there was a killer loose in the house, we do not know how much of this information was available to defendant at the time she made the statement in question, or, if it was available to her, whether she understood the full significance of it. Motive is of major importance in a circumstantial evidence case though not indispensable to conviction. *State v. Sack,* 210 Or 552, 556, 300 P2d 427 (1957). The absence of motive is a circumstance from which a jury can draw an inference of innocence. We do not believe that lack of motive alone gives rise to a sufficient inference of innocence to make impossible conviction by circumstantial evidence, though it certainly is a matter for consideration in weighing the convincing power of the State's case and thus whether there was proof from which guilt could be inferred beyond a reasonable doubt.

In addition to those circumstances connecting defendant to the crime there is the consciousness of guilt manifested by the defendant. During the investigation she seldom, if ever, told the truth about anything which was capable of objective proof.

■ It is our impression that the inferences of guilt that may be drawn, as compared with contrary inferences which are permissible after factual disputes are settled in favor of the State, leave a sufficient preponderance towards guilt to permit a jury to find guilt beyond a reasonable doubt. If the members of the court were jurors, some of us might not be convinced of defendant's guilt beyond any reasonable doubt. However, that is not our position here. The question for us at this stage is whether the evidence

is sufficient for an honest and well-motivated juror to find guilt beyond a reasonable doubt. We believe that one could, though we might not were we in his place.

■ The defendant also contends that the trial court erred in admitting the evidence of the neutron activation analyses. She contends that because the particular bullet samples contained in each lot were not shown to have come from a particular production batch the average of their chemical qualities did not establish a common denominator for each group which meant anything. It is our conclusion that there is a sufficient probability that bullets of the same type which are found together come from an identical source to allow the admission of the tests.

Defendant also contends there was insufficient evidence of the total number of batches of similar bullets manufactured by the Western Company to determine whether there was an adequate number of groups tested to create a meaningful cross-section. As an illustration she contends that if a meaningful cross-section of the manufacturer's batches was tested, it might show that the fatal bullet could have come within the averages of 85% of the batches manufactured and thus not prove very much. Assuming that the basis for defendant's contention is proper, and we believe it to be, it is a matter that goes to the evidence's convincing power rather than to its admissibility.

■ All of the weaknesses and strengths of the State's analyses were fully disclosed by the expert testimony from both sides and the jury had an adequate opportunity to give the testimony the weight it merited. While we believe the convincing power of the evidence was not very great, it nevertheless had

some probative value and was admissible. Where the evidence has some probative value, we allow the trial judge some latitude in deciding whether the detrimental aspect of the testimony outweighs its probative value, and we normally do not second-guess the trial judge in the absence of an abuse of discretion. *State v. Harris,* 241 Or 224, 239-42, 405 P2d 492 (1965). 1 Wharton's Criminal Evidence 286-87, § 155, has the following to say on the subject:

> "Because of the wide variety of facts that may have circumstantial probative value, the courts are liberal in admitting evidence of facts which appear to bear some degree of relevance to the matters in issue. Much discretion is left to the trial judge, and his rulings will be sustained if the evidence which is admitted tends even somewhat remotely to show that a fact in controversy did or did not exist."

The Court of Appeals is reversed and the judgment of conviction of the trial court is affirmed.

HOWELL, J., dissenting.

Using the test established by the majority, I believe that the inferences of innocence which may be drawn from the circumstantial evidence adduced by the State were sufficient to establish a reasonable doubt, and therefore the case should not have been submitted to the jury.

I do not believe there was sufficient evidence to establish to a moral certainty and beyond a reasonable doubt that the defendant murdered her father-in-law and mother-in-law. It is true that the defendant lied about her presence in Seattle on the night of the murders. However, proof of lying does not supply all the other links which are missing and which are necessary to connect the defendant with the commis-

sion of the crimes. There is absolutely no proof of any motive on the part of the defendant to kill Mr. and Mrs. Krummacher, nor even any evidence of animosity by defendant toward the decedents. Neither is there evidence that robbery could have been the motive, because Mrs. Krummacher's purse containing $140 was found after the murders.

Further, the State presented no theory of the case which explains all of the physical facts and suggests that the defendant would drive back to the Krummacher home at the coast, kill one of the victims and some time later kill the second victim, cover one with a towel, and carefully clean the other and cover her with a blanket. It also seems unreasonable to infer that the defendant would be the one who dug the bullet from the door casing in the kitchen. At least three shots were fired, but only one bullet was recovered, and there was no explanation for the missing bullets.

Another important item which was missing from the State's case was the complete failure to show that the defendant was anywhere within a hundred miles of the scene.

There are too many missing links in this case, too many important questions which remain unanswered, for me to conclude that sufficient facts were presented from which a jury could find to a moral certainty and beyond a reasonable doubt that the defendant was the one who committed the two murders. I would affirm the decision of the Court of Appeals.

McALLISTER, J. and TONGUE, J. join in this dissent.