## STATE OF OREGON, *Respondent,*
### *v.*
## GEORGE WESLIE HARVEY, *Appellant.*
### (No. 22360, CA 10591)

590 P2d 770

Robert C. Cannon, Salem, argued the cause for appellant. With him on the brief was Schlegel, Milbank, Wheeler, Jarman & Hilgemann, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Catherine Allan, Assistant Attorney General, Salem.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

Defendant appeals after his jury conviction for manslaughter in the first degree. ORS 163.118. He assigns as errors the admission of certain evidence, the denial of a motion for judgment of acquittal and the imposition of a minimum term of incarceration under ORS 144.110(1). The state concedes that the imposition of the minimum sentence for conduct prior to October 4, 1977, was error under *State v. Bussey,* 34 Or App 535, 579 P2d 264 (1978).

The indictment charged that defendant

"did unlawfully and recklessly, under circumstances manifesting an extreme indifference to the value of human life, cause the death of another human being * * * by shooting [her] in the chest area with a shotgun * * *."

Defendant testified that he and the deceased had been seeing each other for two-and-a-half years prior to her death and that they had periodically lived together. On the day of her death he was going to see another woman, but first he drove to the deceased's residence. Although she did not answer the door, he entered anyway. She came into the living room, and they began to talk. When she asked him to let the dog out of his truck, he went to the truck, let the dog out and returned to the house with his loaded shotgun. He testified that he never left the gun unattended in the truck and that he usually kept it loaded.

Inside the house defendant placed the shotgun on the couch. Deceased sat down on the couch and defendant sat on the arm of the couch. He explained to her that he was going to see another woman. After a period of silence, he said, "Well, I might as well leave," and reached for his shotgun. As he pulled the gun toward him, she sprang up, pleading, "Please don't go," and grabbed the barrel of the gun. He tried to pull it away, saying, "The gun is loaded." The shotgun went off, shooting her in the chest and killing her.

Defendant placed her body in his truck. As he was driving to the hospital, his truck broke down. He flagged down a passing fire department ambulance manned by two paramedics. Only one of them (Ribble) was called as a witness by the state. On direct examination he testified that he and his partner were returning from a call and that at an intersection defendant jumped out in front of the ambulance. He testified that defendant's initial words were "that he had just killed somebody." When asked if those were the exact words defendant used, Ribble replied, "Yes." Ribble went to defendant's truck and saw a body lying in the front seat. He immediately radioed for the police. Meanwhile, his partner tried to learn from defendant exactly what had happened.

Defendant was extremely upset. Ribble took him to the back of the ambulance, where they sat and talked. Defendant gave Ribble his driver's license. Then, speaking "in very short, unconnected fragments of speech," he told Ribble that

> "he had walked in the door of his girlfriend's house or this house, and at that point he said he didn't know the gun was loaded. Then he said it discharged and he killed her, and he again went into shock and uncontrollable hysteria. As he calmed down again, we were able to extract the address at which the incident had happened and various other things."
>
> "* * * * *
>
> "He made this statement, this very short fragmentary comment, that he had told her that—that she had told him, excuse me, to never bring a gun, a loaded gun, in the house, and he said he didn't realize it was loaded or something to that effect. I'm not precisely sure, but he spoke in many, many short fragmentary little things, and it is what I drew from what he had said."

Ribble was cross-examined briefly. Defendant's attorney asked only a few questions, which tended to emphasize that defendant had been extremely distraught and in need of aid from the paramedics. Near the beginnning of his redirect examination, the prosecutor attempted to use a copy of a page from a logbook

kept by the fire department ambulance drivers to "refresh" Ribble's recollection concerning what defendant first said to him and his partner. Ribble had testified on direct examination that the logbook was regularly kept by the ambulance drivers and regularly contained observations of unusual events unconnected with actual calls. On redirect he testified:

> "I made out approximately the first half of the logbook and my partner * * * filled out the bottom half with information that I relayed to him."

The logbook entry was made immediately upon their return to the station.[1]

■ When the prosecutor attempted to use the logbook to "refresh" Ribble's recollection, defendant's attorney objected that "[t]his is the rebuttal phase, and I can't see—he's got him on direct examination." The objection was sustained. The prosecutor then offered the logbook entry as a past recollection recorded, claiming that it referred to matters raised in cross-examination. The court then said to defendant's attorney, "It's relevant if that is true. You have any objection?" Defendant's attorney did not at that point claim that

---

[1] The logbook entry was as follows:

" 'Upon returning to station 50' N. of intersection we were stopped by man who jumped out in front of our rig. He yelled he had murdered someone and went over to a white P.U. parked on Rt. shoulder of road. Gentleman *very* upset. Laying on front seat of vehicle was a female with apparent injuries to chest. I returned to vehicle and summoned assistance thru our dispatcher from the County & State Police.* I took one look at victim & was certain she was dead. I turned to ask the driver what happened & he collapsed alongside P.U. I picked him up and again asked what happened. He stated he had accidently shot victim with a shotgun. I then turned him over to Ribble who took him to the mod. to try to calm him down. I then, carefully, checked female. There was a doberman pincer sitting on her legs looking out the passenger window. He made no attempt to attack. I turned P.U. engine off, shut off lights & CB. I then waited by P.U. for police to arrive. Ribble was told that the incident happened at 255 NW Franklin. He gave his name as George Weslie Harvey, DOB-8-18-40. He stated he worked in Hood River and had just returned home. He entered house with loaded shotgun. While unloading, gun went off striking her in chest. He then loaded her in P.U. and headed for hospital. The drive shaft and muffler fell off at 20 & Denser. He flagged us down for help. Turned over to . . .' "

*At this point Ribble's writing stopped and his partner's began.

[ 533 ]

the logbook was beyond the scope of the cross-examination. Rather, he replied:

> "Yes, your Honor. The witness has testified; he's testified without the aid of his notes. We submit that the best evidence is clearly his testimony, that he has not indicated that he needed to rely on it in his testimony; that furthermore, it contains information written by other persons which, even though under his direction, contains observations which he did not personally make, and we would object on all those grounds."

The logbook entry was received as a past recollection recorded.

Defendant argues that the logbook was hearsay and that the past recollection recorded exception to that rule was improperly applied by the trial court. The state contends that that point was not properly preserved below, but we disagree. One reasonably clear component of defendant's objection was that Ribble had testified without a memory lapse, thus precluding the use of the recorded recollection. *See Elam v. Soares,* 282 Or 93, 577 P2d 1336 (1978). The state argues alternatively that the logbook entry came within the business records exception to the hearsay rule. Whether or not that is true we need not decide, because another issue is dispositive.

Although the "best evidence rule" (as that term is now used) was not involved because the content of the logbook was not itself in issue, defendant's objection did properly raise "the more basic primary/secondary evidence distinction." *Scanlon v. Hartman,* 282 Or 505, 509, 579 P2d 851 (1978). In *Scanlon* the plaintiff's treating physician had his memory refreshed by referring to a letter he had written. With his memory so refreshed, he testified that the plaintiff had complained of headaches the first time he saw her. The letter was subsequently received into evidence as a business record. The Supreme Court held that the secondary evidence (the letter) should not have been received after the primary evidence (the doctor's oral testimony) had been given.

In support of its holding in *Scanlon* the court quoted from *Manchester Assur. Co. v. Ore. R.R. Co.,* 46 Or 162, 166-7, 79 P 60, 69 LRA 475 (1905):

> "The theory * * * [is] that a memorandum is but secondary evidence of the facts of which it speaks, the primary evidence being the knowledge of the witness, if he is able to testify truly as to the facts mentioned, or if he is enabled to testify from present recollection after having had his mind quickened by the memorandum—that is to say, of his own knowledge, independent of the memorandum; and it is only when this primary proof is not available that resort may be had to the secondary * * *."

That opinion was based on *Friendly v. Lee,* 20 Or 202, 205-6, 25 P 396 (1890), where the court stated;

> "* * * [T]he memorandum itself is not admissible in evidence except in cases where the witness at the testifying has no recollection of what took place, further than he accurately reduced the whole transaction to writing. * * * As indispensable to the admission of such testimony, there must be proof that the witness who made the memorandum had no recollection of the matter stated therein, independent of the written paper. When he has such recollection, the evidence is inadmissible. * * *" (Citations omitted.)

In *Susewind v. Lever,* 37 Or 365, 367-8, 61 P 644 (1900), the court explained the rule as follows:

> "* * * A witness is allowed to refresh his memory respecting a fact by anything written by himself, or under his direction, at the time when the fact occurred or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew the same was correctly stated in the writing * * *. The memorandum, however, is not admissible in evidence, except when the memory of the person who wrote it, or caused it to be made, is not refreshed by its inspection, and as a witness he testifies that he knew the writing was correct when made, but that he is unable to detail the particulars from recollection. It is the duty of a party to introduce the best evidence that is within his power to produce, and if he call a witness who, after examining a memorandum made by him or under his direction, remembers the facts

therein stated, the knowledge of the witness in this respect is superior to the memorandum, and better subserves the purpose of a trial, because it affords an opportunity of cross-examination, thereby rendering the writing inadmissible * * *. Where, however, the memory of the witness is not refreshed by an examination of the writing he has made, so as to enable him to state the particulars from recollection, and he testifies that he knew when the memorandum was made that it correctly stated the facts, it then becomes admissible, because it is the best evidence procurable under the circumstances. * * *" (Citations omitted.)

■ The state argues that the logbook entry was admissible despite the primary/secondary evidence distinction because Ribble had a faulty recollection or, alternatively, because the state was improperly prevented from demonstrating the alleged insufficiency in his memory. Taking the latter point first, the state claims that had it been allowed to proceed and use the logbook to refresh Ribble's memory, the insufficiency in his recollection would have become clear. The answer to that contention is that the question concerning defendant's initial words to Ribble was not proper redirect examination, because the matter was not covered in cross-examination.

■■ The state's other argument is that Ribble's memory of the incident was so inadequate or faulty that the secondary evidence was admissible. There was no indication, however, in Ribble's direct, cross- or redirect examination prior to the offering of the logbook that his memory was in any way inadequate or faulty. In particular, he testified clearly and unequivocally concerning the point for which the logbook was offered, *i.e.,* defendant's initial statement. The state claims that the inconsistency between Ribble's testimony and the logbook on that point demonstrated a sufficient fault in his memory to permit the introduction of the logbook as substantive evidence. We need not now attempt to determine the precise degree of insufficiency or fault in a witness' testimony that would permit the introduction of secondary evidence.

It is clear under the cases quoted above that where a witness has given no indication that he is unable fully and accurately to recall the events in question, an inconsistency between his oral testimony and the written memorandum is not sufficient in itself to permit the introduction of the memorandum as substantive evidence. The logbook entry should not, therefore, have been admitted, whether it came within the business records exception to the hearsay rule or not.[2] *Susewind v. Lever, supra; Friendly v. Lee, supra.*

■ The state urges that the admission of the logbook was not prejudicial. We do not agree. The other evidence was not overwhelming, and we cannot state with confidence that the logbook—which contained both the statement that defendant said he had just "murdered someone" and an explanation of the shooting by defendant inconsistent with his story on the stand—had no effect on the jury's verdict. *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973).

■ Although the conviction is reversed and the matter remanded because of the admission of the logbook entry, we consider two additional arguments, the first of which would, if meritorious, preclude retrial. Defendant argues that his motion for judgment of acquittal (made at the close of the state's case and renewed at the close of his case) should have been granted on the ground that the evidence offered to prove that defendant acted under circumstances manifesting extreme indifference to the value of human life was insufficient to go to the jury.

There was evidence sufficient for the jury to find the deceased was killed by defendant's shotgun, that he took the loaded gun into her house despite her admonitions and that the gun went off while defendant was handling it. There also was testimony from

---

[2]When a document qualifies as a business record and the person who prepared it has not been called as a witness, the primary/secondary evidence distinction should not be interpreted to require a showing of unavailability of such a witness. Such a requirement would be inconsistent with the Uniform Business Records as Evidence Act, ORS 41.680 *et seq.*

which the jury could infer that the shotgun would not discharge unless the hammers were pulled back and testimony from an expert witness that both the hammer and trigger pulls were heavy, *i.e.,* they were difficult to pull. Moreover, the expert said that tests of the gun showed that when it was cocked and the hammers pulled back, it could not be made to fire by hitting it on the floor. A gunsmith also testified that he could not make the gun fire accidentally. That evidence, and the inferences which can be drawn from it, along with the evidence that defendant was well-experienced with firearms, was sufficient to go to the jury on the issue of extreme indifference to the value of human life. *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974).

■ Finally, because the issue may arise on retrial, we consider defendant's argument that the trial court improperly admitted testimony of deceased's neighbor that several minutes prior to the shooting he heard defendant and the deceased arguing outside her house. He testified that she said, "Why don't you leave me alone, you sonofabitch," and that defendant replied, "Shut your goddam mouth, you bitch." Defendant's attorney objected on the ground that those statements were hearsay. The state points out that the statements were clearly not offered to prove the truth of the matters asserted and were not, therefore, hearsay. Nevertheless, defendant argues that the statements should have been excluded because they were not relevant and that the issue of relevancy was properly raised by his hearsay objection.

It is true that the following has been stated in regard to the hearsay rule:

"The exclusionary force of the hearsay rule is not applicable when the extra-judicial statement of a third person is not offered to prove the truth of the utterance, but only to show that the statement was made. Where the mere fact that the statement was made is independently relevant, regardless of its truth or falsity (as, for example, to show the state of mind of the declarant,

[ 538 ]

where that fact is in issue), such evidence is admissible. * * *" *Marr v. Putnam,* 213 Or 17, 25, 321 P2d 1061 (1958).

Nevertheless, where an out-of-court statement is *offered* for some purpose other than to prove the truth of the matters asserted therein (as the statements here clearly were), the objecting party must specifically raise the issue of relevance. A hearsay objection does not preserve the relevance issue.

■  If relevance were properly before us, we would hold the testimony admissible.

Reversed and remanded for a new trial.