Argued and submitted July 5, affirmed November 9, 2005, petition for review denied February 21, 2006 (340 Or 158)

## STATE OF OREGON,
*Respondent,*

*v.*

## GEORGE LAVERNE JOHNSON,
*Appellant.*

01-FE-0615-ST; A121762

123 P3d 304

Michael R. McLane argued the cause for appellant. On the brief was Steven D. Bryant.

Kaye E. McDonald, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

## SCHUMAN, J.

After defendant's friend Killingsworth informed police that she believed defendant was attempting to recruit her into a plan to help him kill his wife and daughter, defendant was arrested, tried on a variety of charges, and ultimately found guilty of attempted aggravated murder, attempted murder, and solicitation. On appeal, he assigns error to the trial court's denial of his motions for a judgment of acquittal. He argues that the state did not adduce sufficient evidence to prove that his words and conduct amounted to either an attempt or a solicitation. We affirm.

■    In reviewing the denial of a motion for a judgment of acquittal, our task is to determine whether the evidence and the reasonable inferences drawn from it, viewed in the light most favorable to the state, are sufficient to permit the factfinder—here, the court—to find defendant guilty beyond a reasonable doubt. *State v. Lotches,* 331 Or 455, 498, 17 P3d 1045 (2000), *cert den,* 534 US 833 (2001); *State v. Krummacher,* 269 Or 125, 137-38, 523 P2d 1009 (1974). Under that standard, the relevant facts are as follows.

At the time of the charged crimes, defendant was married, the father of two children, and an employee of a religious publishing company in Bend. He also was having extramarital affairs with two women and sexually abusing his daughter.[1] At some point, his employment tasks stopped filling his work hours, so he began to spend much of each day on the Internet. All told, he visited up to 80 different chat rooms. In some of them, anonymous participants engaged in role-playing, and some of the roles were deranged murderers and torturers. At first, defendant only observed; ultimately, he began to participate. Among other roles, he portrayed people who killed their wives and other family members.

At around the same time, defendant met B through an Internet dating service and they began an affair. In an e-mail to her, he confided that he wished that his wife could

---

[1] Defendant pleaded guilty to two counts of abuse, and they are not part of this appeal. We mention them and his affairs only because they relate to the question of defendant's motive for the crimes that are at issue.

be killed in what would look like an accident with another car. He told B that, in his vision of the event, his wife would be a passenger in his car and B would be driving the other vehicle. B did not take defendant's musings to be in earnest, and she did not report them to police.

As the end of his relationship with B was approaching, defendant met Killingsworth in a public Internet chat room. Soon, they began "chatting" through private instant messaging. Transcripts of several of their chats, saved by Killingsworth after she became alarmed at some of defendant's ideas, were exhibits at trial. They disclose a steady progression from the innocuously romantic to the perverse and deranged. Early messages included relatively harmless fantasies "our skin together, melding into one," "a walk along the river, a picnic in a meadow or out in the warm desert," and such. Slowly, defendant began to introduce more menacing topics into the conversations. He mentioned, "[T]his will sound really bad, the one other thought I had since meeting you is that my wife would just drop dead literal[l]y. She is going to cause some trouble right now." Again, after Killingsworth told him that she was "there" for defendant's needs, he told her, "I have a need but it['s] just so far fetched and bad." He elaborated, referring to his wife: "[I] just wish someone would break into the house and take care of her." In response, Killingsworth told defendant, "I'm expert with a gun," and added, "[I] could drop her at 600 yards." After some time, defendant's daughter was added as an additional victim—in defendant's terms, a "bonus." He discussed various forms of murder, including graphically described tortures.

Throughout the on-line communication, defendant frequently asserted that the talk about killing his wife and daughter was just "a dream" and that he was "just kidding." The following dialogue illustrates that practice and may explain its purpose:

"[Killingsworth]:   You want me to put an end to things?

"[Defendant]:   I would be silly to say yes to something like that.

"[Killingsworth]:   Why?

"[Defendant]: Because, that would be soliciting and illegal and this system isn['t] private.

"[Killingsworth]: I see. You['re] right. We should just talk on the phone about it I guess. Are you there?

"[Defendant]: Since we are just kidding, we can talk about it anywhere. Kidding is wrong, since we are dreaming."

At some point thereafter, defendant and Killingsworth had at least one telephone conversation. The parties' recollections of the conversation or conversations differ; the trial court found that Killingsworth's rendition was credible, and we defer to that well-documented and thoroughly explained finding.

Killingsworth did not recite the precise words exchanged by telephone; rather, she reported that the call or calls focused on the subjects broached in the instant messaging dialogues but had "a little more detail." In particular, she testified that defendant complained that he wanted to leave his marriage but feared that his wife would take all his money in a divorce; therefore, he concluded that he could escape his marriage only by having his wife killed. He discussed the possibility of torturing her, but decided that shooting her to death would suffice. He described his house plan and mentioned that the sliding glass doorway to his wife's bedroom was not lockable. Further, he stated that it would be easy to continue down a hallway to shoot his daughter. Finally, he asked Killingsworth to visit him on a date when his wife would be out of town so that she could see the house and they could finalize a plan. A *quid pro quo* was discussed; once the plan was completed, defendant stated, Killingsworth would "never want for anything."

None of this discussion by telephone was qualified by references to dreams or fantasies; Killingsworth took defendant to be serious. For that reason, she informed defendant that she was going to turn over to the Bend police a transcript that she had printed of their e-mail conversations. He offered her $10,000 to refrain from that action, but she did it anyway. Defendant was subsequently arrested and tried before a judge. He was found guilty on six counts of the indictment: Count 1, attempted aggravated murder of his wife by

payment to another to commit the murder, ORS 161.405 and ORS 163.095(1)(b); Count 2, attempted aggravated murder of his daughter by payment to another to commit the murder, *id.*; Count 3, attempted aggravated murder, multiple victims, ORS 161.405 and ORS 163.095(1)(d); Count 4, attempted murder of his daughter, ORS 161.405 and ORS 163.115; Count 5, solicitation to commit aggravated murder (multiple victims), ORS 161.435 and ORS 163.095(1)(d); Count 6, solicitation to commit murder, ORS 161.435 and ORS 163.115. In order to comply with ORS 161.485(2) (multiple convictions barred in inchoate crimes), the trial court ruled that, "Counts 3 and 5 merge into Counts 1 or 2 and Counts 4 and 6 also merge into Counts 1 or 2, resulting in only two convictions and sentences."

■    We begin with defendant's argument that the trial court erred in denying his motion for a judgment of acquittal on the charges of solicitation under ORS 161.435. That statute provides, in part:

> "(1) A person commits the crime of solicitation if with the intent of causing another to engage in specific conduct constituting a crime punishable as a felony or as a Class A misdemeanor or an attempt to commit such felony or Class A misdemeanor the person commands or solicits such other person to engage in that conduct."

According to defendant, the statute imposes three requirements that the state must meet in order to obtain a conviction and, he argues, it met none of them: first, it failed to adduce evidence revealing the actual text of his written or oral statements requesting Killingsworth to kill his wife and daughter; second, it failed to demonstrate that the request urged specific conduct pursuant to a concrete plan; and third, it failed to adduce evidence that defendant offered Killingsworth a *quid pro quo* for killing his wife and daughter.

Defendant provides no authority, and we find none, for the proposition that the state must produce the actual words used by the solicitor (or, for that matter, that words must be used), nor for the proposition that the state must prove that the solicitor offered the solicitee a *quid pro quo*. Indeed, all indications are to the contrary. The text contains

no such requirements and we are not at liberty to add them. ORS 174.010. The legislative history reveals only that the term "solicit" was chosen "because it is an historic legal term that would carry with it the traditional limitations that are intended," Commentary to Criminal Law Revision Commission Proposed Criminal Code, Final Draft and Report § 57, 56 (July 1970) (quoting Michigan Revised Criminal Code, Final Draft (Sept 1967), § 1010, 94) (Commentary), and we have found no "traditional limitations" involving the necessity of providing words or providing *quid pro quo*. In fact, at common law, solicitation could be committed by speech, writing, or nonverbal conduct. Wayne R. LaFave, 2 *Substantive Criminal Law*, § 11.1(c), 196 (2d ed 2003). No Oregon case indicates otherwise. Insofar as the necessity of a *quid pro quo* is concerned, one of our recent cases appears to confirm that a *quid pro quo* is *not* necessary. In *State ex rel Juv. Dept. v. Krieger*, 177 Or App 156, 158-59, 33 P3d 351 (2001), we held, without discussion, that a juvenile committed solicitation merely by importuning several classmates to help him blow up or shoot up his school—with no mention of payment.[2]

■    Defendant's argument that the state must establish a "specific," concrete plan requires more discussion. The statute itself specifies that the *mens rea* of solicitation is "the intent of causing another to engage in specific conduct constituting a crime * * *." ORS 161.435. Further, the legislative history indicates that the "specific conduct" element served to ensure that enforcement of the statute did not violate free speech guarantees: The phrase "is designed to allay some of the problems with respect to encroachment on traditional free speech concepts" and to prevent "legitimate agitation of an extreme or inflammatory nature from being misinterpreted as soliciting to crime." Commentary, § 57 at 56. Quoting from a comment to the Model Penal Code, the Commentary states:

"'A general exhortation to "go out and revolt" does not constitute solicitation * * *. It is necessary in the context of the background and position of the intended recipient that

_____

[2] In any event, there was evidence that defendant offered a *quid pro quo* when he indicated to Killingsworth that, if she murdered his wife and child, she would "never want for anything."

the solicitation carry meaning in terms of proposing some concrete course of conduct that it is the actor's object to incite.' "

*Id.* Defendant takes this comment to mean that, in order to avoid constitutional infirmity, "specific conduct" must mean that the solicitor and the solicitee agree on the details (time, place, manner) of the conduct that is the subject of the solicitation.

We disagree. Under defendant's interpretation, no solicitation would occur if a person were to engage a hired killer to murder a named individual but failed to specify when or where the murder should occur or how the killer should accomplish it. A more logical (and syntactically coherent) reading is that the level of generality at which the term "specific" operates is not the time, place, and manner of the conduct, but its criminality. In other words, the state needs to prove that a defendant has engaged another person, intending that the other person engage in *any* specific conduct that constitutes a crime. The conduct must be specifically criminal (that is, it cannot be "revolt!") but details of how the crime is to be committed need not be *specified*.

That reading makes sense of the legislative history, as well. As long as solicitation applies only to "*some [i.e.,* any] concrete course of conduct that it is the actor's object to incite," *id.* (emphasis added), the law will not be applied to a "general exhortation," *id.*, and will therefore avoid unconstitutionality. Finally, defendant's interpretation cannot be squared with *Krieger*, where a juvenile was found to have committed solicitation merely for asking others to help in "blow[ing] up" or "shoot[ing] up" the school.

We therefore conclude that the trial court did not err in denying defendant's motion for a judgment of acquittal on the solicitation charges if the evidence, viewed in the light most favorable to the state, could rationally be seen to establish that defendant solicited Killingsworth to murder his wife and daughter.[3] We conclude that the evidence suffices.

---

[3] Defendant asserts that the state had to prove solicitation not merely to commit murder, but to commit murder with aggravating factors. That is because the solicitation counts on which defendant moved for a judgment of acquittal, Counts 5 and 6, both specify that defendant solicited Killingsworth to engage in acts

A reasonable finder of fact could find that defendant proposed to Killingsworth that she engage in the specific criminal conduct of murdering defendant's wife and daughter. In particular, a factfinder could conclude from the e-mail exchanges and phone conversations (as credibly related by Killingsworth) that: defendant wanted his wife dead so he could avoid the financial consequences of a divorce; he wanted his daughter dead because his sexual involvement with her could "cause trouble"; he thought Killingsworth was able to do the killing; he made overtures concerning that possibility; he told Killingsworth that it would be a "bonus" if his daughter were present when his wife was killed; he described to Killingsworth the house plan (including the location of his wife's and daughter's bedrooms) and access to the house; he suggested a date for the killings; he invited Killingsworth to visit the house and finalize the plans; and, Killingsworth's dealings with defendant led her to conclude that he wanted her to kill them both. That testimony could permit a finder of fact to understand that defendant indeed engaged Killingsworth to kill his wife and daughter. The trial court's denial of defendant's motion for a judgment of acquittal on the charge of solicitation to commit aggravated murder was not error.

■   Defendant also assigns error to the trial court's denial of his motion for a judgment of acquittal on the charges of attempted aggravated murder of his wife and daughter, ORS 161.405 and ORS 163.095, based on the argument that defendant's electronic and telephone statements did not constitute a "substantial step" for purposes of attempt. According to defendant, even if his conduct amounts to criminal solicitation under ORS 161.435, mere solicitation cannot, as a matter of law, constitute a substantial step under the attempt statute. Again, we disagree.

constituting aggravated murder. Count 5 alleged multiple victims and Count 6 alleged murder of defendant's daughter by torture. Although defendant *asserts* that the state needed to prove the aggravating factors, his brief contains no *argument* that the state failed to do so. In any event, such argument would be of no avail. As noted, the record contains sufficient evidence of multiple victims; that would defeat defendant's argument regarding the aggravating factor in Count 5. It also contains sufficient evidence of solicitation to engage in torture; at one point in his e-mail conversation with Killingsworth, he muses about killing his daughter with "a thousand little cuts."

■     ORS 161.405(1) provides:

> "A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward the commission of the crime."

A "substantial step" is more than mere preparation to commit a crime; it must "(1) advance the criminal purpose charged and (2) provide some verification of the existence of that purpose." *State v. Walters*, 311 Or 80, 85, 804 P2d 1164, *cert den*, 501 US 1209 (1991).

Defendant's argument that his solicitation cannot form the basis of an attempt relies heavily on the legislative history of ORS 161.405. In particular, he focuses on a list of examples of "acts which should not be held insufficient as a matter of law to constitute a substantial step." Commentary, § 54 at 51. That list includes "[s]oliciting an innocent agent to engage in conduct constituting an element of the crime." *Id.* Defendant, quoting treatises, explains that an "innocent agent" is one who is unaware that his or her acts are criminal, for example, a person who is engaged to give what he thinks is medicine to a third person when, in fact, the "medicine" is (and was known by the solicitor to be) poison. From the existence of that example in the legislative history, defendant draws the negative inference that, if soliciting an innocent agent *can* be a substantial step and thus an attempt, then soliciting any other kind of agent (such as Killingsworth) cannot.

For a variety of reasons, defendant's argument is not persuasive. First, it is hard to square with the text of ORS 161.405, which says nothing whatsoever about agents, innocent or guilty. Second, even if we were to conclude that Oregon's attempt statute incorporated the list in the Commentary, that fact would not imply what defendant wants it to. To say that soliciting innocent agents can be a substantial step does not, as a matter of logic, imply that soliciting guilty ones cannot. Third, the Commentary does not adopt the list; it includes the list as examples of actions that "could be held to be substantial" because they are "strongly corroborative" of the actor's criminal intent. Commentary, § 54 at 51.

In fact, the Commentary's treatment of solicitation and its relation to attempt is inconclusive. Its treatment of *State v. Taylor*, 47 Or 455, 84 P 82 (1906), demonstrates that fact. In *Taylor*, the defendant solicited a knowing (as opposed to innocent) agent to commit arson, and the court held that the solicitation amounted to an attempt. 47 Or at 465. In discussing the case (among others) in the Commentary to what would become the attempt statute, the commission wrote, "The very few Oregon attempt cases found [including *Taylor*] indicate that the language of the draft section both as to intent and the nature of the act is *generally in accord* with existing Oregon law." Commentary, § 54 at 52 (emphasis and bracketed terms added). That statement would indicate that *Taylor* remains good law even after the adoption of ORS 161.405.

Discussing the draft *solicitation* statute, however, the commission reported that *Taylor* represents a minority view and explained that, under the majority view, solicitation "does not *ordinarily* constitute an attempt." Commentary, § 57 at 57 (emphasis added). The commission noted that at the time *Taylor* was decided, "Oregon had no general solicitation statute," and "[t]hus, for justice to reach the defendant in the *Taylor* case, the general attempt statute was employed." *Id.* As a consequence, the commission claimed that *Taylor* "in effect [made] solicitation the equivalent of a criminal attempt." *Id.* However, the commission did not disavow *Taylor*, nor did it categorically state that any solicitation constitutes nothing more than "mere preparation." Legislative history, then, provides defendant with no significant support.

Nor does case law. In *State v. Sargent*, 110 Or App 194, 198, 822 P2d 726 (1991), we held that, "if a person solicits another to engage in conduct constituting an element of the crime of delivery, *e.g.*, to provide to the person a controlled substance for the purpose of distribution to third parties, the person has attempted delivery * * *."[4]

---

[4] It is true, as defendant notes, that, in *Ralston v. OSCI*, 92 Or App 513, 517, 759 P2d 298 (1988) (Graber, J., concurring in part and dissenting in part), Judge Graber states that "[m]ere solicitation," although a "step" in the commission of a crime, is not "substantial" for purposes of attempt. In addition to the fact that a

■ We see no reason to depart from that reasoning here, and we decline to hold that solicitation of a knowing agent is categorically disqualified as a "substantial step" under ORS 161.405.[5] Rather, as the statute plainly states, solicitation requires a "substantial step." Solicitation of a guilty person qualifies as a "substantial step" if, under the facts, the defendant's actions exceed mere preparation, advance the criminal purpose charged, and provide some verification of the existence of that purpose. *See State v. Jessen*, 162 Or App 662, 668, 986 P2d 684 (1999), *rev den*, 329 Or 589 (2000).

Viewing the evidence in the light most favorable to the state, a reasonable finder of fact could conclude that defendant's conduct constituted a substantial step toward commission of the murder of his wife and daughter. As explained above, ample evidence would permit a finding that defendant solicited Killingsworth to kill his wife and daughter. That solicitation, it could be concluded, served to advance defendant's criminal purpose—murdering his wife and daughter. A reasonable finder of fact could conclude that the same evidence of defendant's conduct verified his criminal purpose: his statements permit the conclusion that he wanted his wife and daughter dead, he engaged Killingsworth to kill them, and he advised her on how to do so. A reasonable finder of fact could find that defendant's solicitation exceeded mere preparation. *See Sargent*, 110 Or App at 198 ("[I]f a person solicits another to engage in conduct constituting an element of the crime of delivery * * * the person has taken a substantial step toward committing the crime of attempted delivery * * *.").

■ In addition, a finder of fact could conclude that the aggravating factors under ORS 163.095(1)(b) and (d) were present. Paragraph (1)(b) requires proof that defendant "solicited another to commit the murder and paid or agreed to

statement in a concurring and dissenting opinion has no precedential value, Judge Graber's statement relies on the common law and on cases decided before the current criminal code was adopted.

[5] The majority rule that solicitation generally cannot amount to an attempt was possibly driven by the concern that the same act could expose a defendant to multiple prosecutions. Under the current law, however, that concern is addressed by ORS 161.485(2), which prohibits multiple convictions for inchoate crimes "designed to commit or to culminate in commission of the same [substantive] crime."

pay the person money or other thing of value for committing the murder." Killingsworth's testimony concerning defendant's assurance that she would want for nothing if she committed the crimes and her statement that they arranged payment would permit a finder of fact to conclude that this factor was present. Paragraph (1)(d) requires proof of "more than one murder victim in the same criminal episode * * *." Again, evidence that defendant planned that Killingsworth would have occasion to kill both his wife and daughter permits a finder of fact to conclude that that factor was present. The trial court's denial of defendant's motion for a judgment of acquittal on the charges of attempted aggravated murder was not error.

Affirmed.